UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

```
┌─────────────────────────────────────────┐
│ USDC SDNY                                │
│ DOCUMENT                                 │
│ ELECTRONICALLY FILED                     │
│ DOC #: _____                 │
│ DATE FILED: September 29, 2014           │
└─────────────────────────────────────────┘
```

CHELSEA GRAND, LLC,                    :

        Petitioner,                    :          07 Civ. 2614 (PAC)

    -against-                         :          **OPINION AND ORDER**

NEW YORK HOTEL AND MOTEL TRADES        :
COUNCIL, AFL-CIO,

                :

        Respondent.                    :

------------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:

      Chelsea Grand, LLC owns a Four Points by Sheraton hotel on West 25th Street in Manhattan ("Chelsea Grand"). The New York Hotel and Motel Trades Union Council, AFL-CIO ("Union") is a labor union which represents hotel workers. The Union maintains that because of a hotel management contract Chelsea Grand had with Interstate Hotels & Resorts ("Interstate"), Chelsea Grand became bound to certain provisions of pre-existing agreements between Interstate and the Union. The Interstate-Union agreement provided for resolution of any and all disputes by the "Office of Impartial Chairman," which served as the hotel industry's arbitrator. Interstate and the Union appeared before the Impartial Chairman's Office which held, in a series of rulings, that Chelsea Grand was bound by the card check and neutrality provision of the agreements between Interstate and the Union, and that Chelsea Grand was in violation of those provisions (the "Award"). Accordingly, the Office of the Impartial Chairman imposed a substantial penalty which continued until there was acceptance. The penalty imposed essentially equaled the daily receipts of the Chelsea Grand.

On March 23, 2007, Chelsea Grand commenced a New York Civil Practice Law and Rules Article 75 proceeding in New York Supreme Court challenging the validity of the arbitral proceeding. Chelsea Grand asked that the Award be set aside because:

(1)     fraud or misconduct existed;

(2)     the procedures of Article 75 of the C.P.L.R. were not followed;

(3)     no valid agreement to arbitrate existed; and

(4)     the agreement to arbitrate was not complied with.

The Union removed the State action to federal court asserting that the parties had a labor dispute under L.M.R.A. § 301, 29 U.S.C. § 185. The Union seeks enforcement of the Award by the Office of Impartial Chairman.

Chelsea Grand asserts that it cannot be bound by Interstate's agreement with the Union because Interstate lacked the authority to sign any union contract on behalf of Chelsea Grand. Further, Chelsea Grand asserts that Interstate did not supervise the hotel employees; rather, a Chelsea Grand affiliate, StarPerfect Management Inc. ("StarPerfect"), was responsible for that task.

While Chelsea Grand's legal strategy is to minimize Interstate's role at Four Points by Sheraton, there is no doubt that Interstate's appointment as the managing agent of the hotel was critical to Chelsea Grand's obtaining the Four Points by Sheraton franchise, along with the very valuable access to Sheraton's worldwide reservation system. When Chelsea Grand refinanced the hotel with Merrill Lynch, it listed Interstate as the managing agent. That, too, was critical to the success of the refinancing. Finally, Interstate provided critical hotel management services at the hotel's Front Desk or Front Office. Chelsea Grand attempts to emphasize its role in managing the housekeeping staff (*i.e.*, making the beds), but making beds is not what makes the

hotel a success. Rather, it is the reservation system, the financing, and the management of the Front Office/Front Desk functions that are critical to success.

Ultimately, the case hinges on the following questions: (1) was Interstate bound by the Card Count/Neutrality Clause in the 2001 Industry Wide Agreement; (2) if so, did Interstate bind Chelsea Grand to the 2001 Industry Wide Agreement as a Joint Employer; or (3) did Interstate have the authority to bind Chelsea Grand to the 2001 Industry Wide Agreement as its agent.

The Court determines that Interstate was bound by the Card Count/Neutrality Clause of the 2001 Industry Wide Agreement. Since Interstate was already bound, it could bind Chelsea Grand to the same agreement, either as a joint employer (and the Court determines that Interstate and Chelsea Grand were joint employers) or as Chelsea Grand's agent (and the Court finds that Interstate was Chelsea Grand's disclosed agent with apparent authority to bind Chelsea Grand).

## FINDINGS OF FACT

### I.     The New York Hotel Industry

Major hotels in New York City, particularly in Manhattan, generally belong to the Hotel Association of New York City ("HANYC"). HANYC has two classes of membership: general and collective bargaining. Members of the collective bargaining class are members of a multi-employer bargaining unit which bargains with the Union on behalf of some 27,000 hotel employees. These hotels are either members of the multi-employer bargaining unit; but if not, then they sign "me too" agreements that bind them to the terms of the multi-employer bargaining unit agreement. "Me too" agreements frequently contain individually bargained modifications tailored to the specific needs or interests of individual hotels and managers.

The collective bargaining agreement at issue—the Industry Wide Agreement ("IWA")—dates to 1990, but has been renewed every five or six years to reflect new wage rates, benefits and other terms and conditions of employment. Prior versions of the IWA included a card check and neutrality clause ("Card Check/Neutrality Clause"), which obligated hotel owners and managers to provide the Union access to employees, to permit the Union to organize employees through a card check process, and to remain neutral throughout the union organizing process. The IWA also included an arbitration clause, which provided that the Office of Impartial Chairman would resolve any and all disputes of any kind arising out of the agreement.

HANYC and the Union entered into a Memorandum of Understanding ("MOU"), which modified the terms of the existing IWA ("2001 IWA"). The MOU was to become effective on June 1, 2001. On June 23, 2000, Kane Kessler, labor counsel to HANYC, wrote to the hotels and managers covered by the agreement to explain the changes in the IWA. The 2000 MOU added an "accretion" clause ("Accretion Clause") to the agreement which provided: "A Hotel that becomes the owner or manager of a hotel in New York City will be required to apply the IWA to that property on the basis of the legal doctrine of accretion. If a court, agency or arbitrator determines that accretion cannot be applied, the Union retains its existing right to apply the Neutrality Agreement to that Property." Where accretion is inappropriate, the Union may go straight to a card count method without a formal determination against accretion.[1]

---

[1] Chelsea Grand's argument that accretion is a condition precedent to Card Count/Neutrality–in other words, the Union must first attempt to accrete a new bargaining unit and have that effort rejected (presumably years later) by a competent authority before it can use the Card Count/Neutrality provisions–is nonsense. It ignores the bargaining history over the Card Count/Neutrality provisions, the actual language which does not make one contingent upon the other and common sense. Chelsea Grand's argument requires the Union to subordinate an existing right to a new provision which has never been tested and might very well be rejected by a competent authority. There is no explanation for why the Union would do this. The Court rejected this argument on the record.

Upon receipt of this Memorandum, on July 24, 2000, Interstate's Senior Vice President and General Counsel wrote to HANYC's labor counsel concerning the modifications to the IWA. Referring directly to the Accretion Clause in the MOU, Interstate's general counsel asked:

> Based on the way you describe the accretion clause, it appears that if a manager of a hotel that is subject to the City wide agreement 'becomes the manager of another hotel in New York City,' that new hotel will be bound by the City wide agreement on the basis of the legal doctrine of accretion. Please let me know whether my understanding about this provision is correct.

HANYC affirmed this understanding.

At the time of the June, 2000 memorandum and July 24, 2000 inquiry, Interstate was the manager of two hotels, the Park Central Hotel and the Roosevelt Hotel, which were members of the multi-employer bargaining unit represented by HANYC. Further, Interstate received the MOU as a member of the collective bargaining unit.

## II.    The Lam Group's Creation of the Chelsea Grand Hotel

Chelsea Grand is owned by the Lam Group, a closely held family enterprise headed by John Lam. Mr. Lam emigrated to the United States and promptly made the most of his opportunities here. He ran a small purse sewing enterprise in Hong Kong before emigrating. Upon arrival in the United States, he opened his own garment factory in New York. He worked hard at this, as did the members of his family. After several years, he had opened a number of factories which employed a large number of employees, many of whom were represented by the garment workers union.

Sensing an imminent decline in the garment industry, Mr. Lam decided to pursue a new venture in the hotel industry. He was not exactly a novice in this new field. He had experience as owner of a Holiday Inn Hotel at the Philadelphia airport. He also had experience as the owner of a Best Western Hotel here in New York City.

Mr. Lam believed that the future success for this new venture, which was to be located in Manhattan, was best achieved by affiliating with better known and higher quality hotel chains. As a result, he sought a franchise agreement with Sheraton Hotels. The Sheraton Hotels, owned by Starwood, had a reputation for quality and would provide access to a world class reservation system. Sheraton would not enter into a franchise agreement with Chelsea Grand. Instead, Sheraton/Starwood required Mr. Lam to obtain a managing agent as a condition of the franchise, and the franchise agreement specifically identified Interstate. And so, Mr. Lam retained Interstate as the Managing Agent for the new hotel; by doing so, he was able to obtain the Four Points Sheraton franchise he sought for his new hotel.

## III.   Chelsea Grand's Relationship with Interstate

In February 2003, Chelsea Grand, as owner, entered into a Hotel Management Agreement with Interstate (the "HMA"), as operator for a Sheraton Four Points Hotel to be located on West 25th Street in the Chelsea section of Manhattan. The agreement vested management in Interstate as follows:

Article III is entitled "General Services by Operator" and provides, in part, that Interstate would perform the following duties:

A.   Recruit, train, direct, supervise, employ (except as otherwise provided herein) and dismiss on-site staff (the "Hotel Employees") for the operation of the Hotel, and in connection therewith establish and maintain an affirmative action plan for the Hotel;

B.   Develop and implement advertising, marketing, promotion, publicity and other similar programs for the Hotel;

C.   Apply for, process and take all necessary steps to procure and keep in effect in Owner's name (or, if required by the licensing authority, in Operator's name or both) all licenses and permits required for the operation of the Hotel excluding liquor licenses or other licenses necessary for the food and beverage operations;

D.     Purchase all Operating Equipment and Operating Supplies necessary for the operation of the Hotel;

E.     Provide routine accounting and purchasing services as required in the ordinary course of business;

F.     Comply with all applicable laws, ordinances, regulations, rulings and orders of governmental authorities affecting or issued in connection with the Hotel, as well as with orders and requirements of any board of fire underwriters or any other body which may exercise similar functions, so long as Owner promptly delivers to Operator any notice of violation thereof received by Owners;

G.     Cause all needed repairs and maintenance to the Hotel of which Operator is aware to be made;

H.     Subject to the prior written approval of the Owner and the terms of a mutually agreed upon technical services agreement, provide project management services as Owner's agent in connection with the making of such capital improvements to the Hotel, or the renovation and refurbishment of the Hotel;

I.     Subject to Section 3.2 below, use commercially reasonable efforts to operate the Hotel in accordance with any mortgage, deed of trust and/or hotel franchise agreement (collectively, "Major Agreements"); and

J.     Provide such other services as are required under the terms of this Agreement or as are customarily performed without additional fee by management companies of similar properties in the area of the Hotel.

Article IV is entitled "General Operation of the Hotel" and provides, in part, as follows:

4.1.     Owner hereby engages Operator as the exclusive operator of the Hotel during the Operating Term and Operator hereby accepts such engagement. Subject to the terms of this Agreement and the applicable Budgets, Operator shall have control and discretion in the operation, direction, management and supervision of the Hotel. Such control and discretion of Operator shall include, without limitation, the determination of credit policies (including entering into agreements with credit card organizations), terms of admittance, charges for rooms, employee wage, benefits and severance policies for any employees employed by Operator, entertainment and amusement policies, and all phases of advertising, promotion and publicity relating to the Hotel. In addition, Operator shall advise, and consult with, Owner on the establishment of employee wage, benefits and severance policies for Hotel Employees of the Hotel who are not employees of Operator.

Article V is entitled "Agency; Hotel Employees" and provides, in part, as follows:

5.1.     In the performance of its duties as Operator of the Hotel, Operator shall act solely as agent of Owner.  Nothing in this Agreement shall constitute or be construed to be or create a partnership or joint venture between Owner and Operator. . . .

5.2.     Other than the General Manager and the Senior Accountant of the Hotel, (both of whom shall be employees of Operator) (herein referred to as the "Operator's On-Site Employees") all Hotel Employees shall be employees of Owner.  All compensation (including without limitation all wages, fringe benefits and severance payments) of the Hotel Employees (including the Operator's On-Site Employees) shall be an Operating Expense (as defined in Section 11.2) and shall be borne by Owner and paid or reimbursed to Operator out of the Agency Account (as hereinafter defined) or if the amounts therein are insufficient by Owner upon demand therefore by Operator.  Operator may, consistent with the Budgets, enroll the Operator's On-Site Employees in retirement, health and welfare employee benefit plans substantially similar to corresponding plans implemented in other hotels with similar service levels managed by Operator or first-class, full-service hotels in the area of the Hotel. . . .

5.5.     Although Owner shall have the right to approve and revise from time to time all Employment Policies for the Hotel Employees (other than the Operator's On-Site Employees), Operator shall consult with and advise Owner on the development and implementation of policies, procedures and programs for the Hotel (collectively, the "Employment Policies") reasonably designed to effect compliance with the Employment Laws.  The Employment Policies shall be consistent with industry standards from time to time for reputable hotel management companies.

5.6.     Owner acknowledges and agrees that Operator shall have the right to institute severance payment policies for the Operator's On-Site Employees so long as such policies are reasonable and customary in the hotel industry.  In addition, Operator shall consult with, and advise, Owner regarding the development and implementation of severance policies for Hotel Employees (other than the Operator's On-Site Employees).

5.7.     Owner shall have the right to interview, and approve the hiring of, the General Manager, which approval shall not be unreasonably withheld or delayed.  In the event that Operator terminates this Agreement pursuant to Section 16.1 hereof, Operator will waive any restrictions contained in any employment agreements with the General Manager or Senior Accountant of the Hotel which prevent such persons from working for the Owner.

Article XVI is entitled "Operator's Special Termination Right."  Paragraph 16.1 provides,

in part, as follows:

16.1.     Operator hereby acknowledges that Owner desires to open and operate the Hotel as a non-union hotel.  Owner acknowledges and agrees that (a) Operator will not participate or assist Owner in resisting any union campaign or organization efforts by any union and (b) Operator and its affiliates manage other unionized hotels in New York City area (including any airport markets servicing the New York City or surrounding areas) and organizational efforts by union(s) with respect to the Hotel employees may affect, disrupt, hinder or interfere with the

normal operations at such other hotels managed by Operator and its affiliates.  It at any time during the Operating Term, Operator determines that the operations or labor relations at the other hotels managed by Operator and its affiliates, are interfered with, disrupted, hindered or affected as a result of labor relations or labor unrest at the Hotel between the Hotel, its employees or any union (or lack of any collective bargaining agreement in effect for the Hotel) ("Labor Issues"), Operator shall have the right, without penalty, to terminate this Agreement by providing to Owner at least one hundred twenty (120) days prior written notice of termination unless Owner cures such Labor Issues to the satisfaction of Operator (which satisfaction will not be deemed given unless acknowledged in writing by Operator) within ninety (90) days of Owner's receipt of such notice, in which case the notice of termination shall be deemed rescinded.  In the event that Operator exercises the termination right described in this Section 16.1 at any time prior to the first (1st) annual anniversary of the Commencement Date, Owner shall immediately pay to Operator the full amount of the Pre-Opening Fee previously waived by Operator, and Operator shall permit Owner to recruit and/or hire any of the then current employees of the Hotel.

The Agreement also provided in Paragraph 21.3, the following:

21.3.   This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, superseding all prior agreements or undertakings, oral or written. Owner acknowledges that in entering into this Agreement Owner has not relied on any projection of earnings, statements as to the possibility of future success or other similar matter which may have been prepared by Operator.

Further, the parties provided in Paragraph 21.5, the following:

21.5.   A waiver of any of the terms and conditions of this Agreement may be made only in writing and shall not be deemed a waiver of such terms and conditions on any future occasion.

For its services, Interstate received a customary fee amounting to two percent of total revenue, but additionally received an incentive fee amounting to ten percent of the Gross Operating Profit which exceeded a specified threshold.  This incentive fee arrangement proved to be very lucrative.  While the customary fee and the incentive fee were negotiated in early 2003, by the time the hotel opened, Chelsea Grand's rack rates were much higher than initially anticipated.  Nonetheless, the Chelsea Grand never attempted to renegotiate or reduce the incentive.  This strongly suggests that Interstate's management role was not minimal nor reduced in any way, as Chelsea Grand now asserts.

### IV.    Chelsea Grand's Relationship with StarPerfect

On or about August 1, 2003, Mr. Lam entered into another management contract with StarPerfect, an affiliated entity run by the Lam family.  StarPerfect served as a vehicle to familiarize the Lam family with hotel management.  Mr. Lam testified that he intended to build other hotels and wanted to be the manager of his own operation.  This, of course, speaks volumes about who was really running Chelsea Grand's Four Points by Sheraton.  Nonetheless, Chelsea Grand argued that StarPerfect's management of all non-supervisory employees shields Chelsea Grand from being bound to any of Interstate's collective bargaining agreements with the Union.  According to Chelsea Grand, StarPerfect relieved Interstate of the functions set forth in 3.1.a and 3.2.a of the HMA, but Interstate remained in charge of the responsibilities listed in 3.1.b-f and 3.2.b-h.[2]  There is no writing documenting this purported change in responsibility.

### IV.    Interstate's Relationship with the Union

On January 15, 2004, the Hotel Trades Council and Interstate entered into a four paragraph Memorandum of Agreement ("MOA") which provided:

> (1)    Effective as of the date of this Agreement and retroactive to July 1, 2001, Interstate agrees to be bound by the Accretion and Card Count/Neutrality provisions of the Memorandum of Understanding dated June 15, 2000 between the Union and the Hotel Association of New York Inc. ("Hotel Association") such that the Union shall be able to apply the Accretion and Card Count/Neutrality provisions to any hotel or concessionaire in the New York City area which came or comes to be owned, operated or managed by Interstate on July 1, 2001 without prejudice or limitation.  The parties agree that this paragraph shall not be applicable to [a hotel at JFK] by virtue of Interstate's management thereof.
>
> (2)    Interstate agrees to adopt, assume and be bound by all the terms and conditions of employment, both economic and non-economic in nature, of any successor collective bargaining agreement to the Industry Wide Agreement between the Union and the Hotel

---

[2] Interstate had previously managed the Best Western Hotel on behalf of John Lam.  That hotel management agreement made Interstate the employer and explicitly specified that the operator was not to sign a collective bargaining agreement.  Mr. Luk testified that such specific language was not necessary in Chelsea Grand's HMA because Mr. Luk had determined that excising the employment function from the Interstate HMA could foil any organizing attempt by the Union.

Association, which expires on June 30, 2006 ("IWA") negotiated between the Hotel Association and Union, which should serve to extend, supersede and/or modify the IWA, on its own behalf and on behalf of any hotel or concessionaire which it currently or hereafter owns, operates, or manages in the New York City area.[3]

(3)     The Union agrees that the Park Central Hotel shall be permitted to lease out part of its property to Starbucks who will operate a retail store on said property. Provided that there shall be no entrance or access to Starbucks from inside the Hotel and that no Starbucks employee will perform any duties or functions currently performed by bargaining unit members, Starbucks will not be considered a concessionaire within the meaning of the IWA nor subject to the accretion and area standards provisions of the IWA.

(4)     Any dispute regarding the interpretation or application of this Agreement shall be subject to the grievance and arbitration provisions of the IWA, which are incorporated herein by reference.

The Union submits that Interstate was already bound to the 2001 IWA prior to the 2004 MOA, and therefore Chelsea Grand became bound through the Accretion Clause. According to the Union, paragraph 1 of the MOA is merely declaratory of what had already been agreed to in the 2000 MOU, which became the 2001 IWA. It is only the second sentence of paragraph 1 that is operative: it excluded the Courtyard by Marriott JFK. Starbucks in the Park Central Hotel is excluded from the IWA by paragraph 3. Absent this exclusionary language, however, both entities would have been bound by the 2000 MOU, and therefore the terms of the IWA. Significantly, the MOA did not exclude Chelsea Grand, and so Chelsea Grand was bound to the 2001 IWA's terms, including the Card Count/Neutrality Clause provisions. The Union maintains this position even though Interstate never signed the 2000 MOU and the 2001 Industry Wide Agreement. Certainly, Chelsea Grand never signed any document which bound it to any agreement or proposal with the Union. Thus, the question arises as to whether Interstate could bind Chelsea Grand to labor agreement(s) which neither Interstate nor Chelsea Grand signed.

---

[3] The Hotel and Trade Council agrees that paragraph 2 is applicable only where the hotel is, in fact, unionized. It is not applicable to Chelsea Grand.

## CONCLUSIONS OF LAW

### I.     Legal Standard

Under the Federal Arbitration Act, an arbitration award may be vacated upon the application of a party to the arbitration if "the arbitrators exceeded their powers."  9 U.S.C. § 10(a)(4).  Here, the Court is asked to determine whether the Impartial Chairman's Award exceeded his powers by finding that Chelsea Grand was contractually obligated to arbitrate under the 2001 IWA.  Despite Chelsea Grand having not signed the 2001 IWA, the Union seeks to bind Chelsea Grand, and therefore bears the burden of proof in this case.  *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004).

### II.    Interstate Was Bound by the 2001 IWA

Before considering whether Interstate can bind Chelsea Grand to the 2001 IWA's arbitration clause, the Court must first determine whether Interstate itself was bound.  The Union argues that Interstate was bound to the 2001 IWA by managing two hotels, the Roosevelt and Park Central, which were part of the 2000 HANYC bargaining group.  There is no evidence or argument to contradict this assertion.  Certainly, no one from Interstate argues to the contrary. The Court agrees that Interstate is bound by the IWA.  Under the Accretion Clause, a hotel that "becomes the owner or manager of a hotel in New York City will be required to apply the IWA to that property."  In other words, the manager of a hotel that is subject to the IWA must apply the agreement to all subsequent hotels that it manages in New York City.  Here, Interstate managed two hotels that negotiated the terms of the 2001 IWA.  Although the Roosevelt and Park Central's authorizations were signed by their general managers, these individuals were

Interstate employees.  In fact, following receipt of the MOA, a senior vice president at Interstate confirmed his understanding that the Accretion Clause would bind its new hotels.  As a result, the Union has demonstrated that Interstate was bound to the 2001 IWA by Roosevelt and Park Central's representations.[4]

### III.    Interstate Bound Chelsea Grand as a Joint Employer

Since Interstate was bound by the 2001 IWA, the Court asks the next question:  Can Interstate bind Chelsea Grand to the Union contract because it is a joint employer?  To determine whether a joint employer relationship existed, the Court must first examine the terms of the agreement between Chelsea Grand and Interstate.  According to Article III of the HMA, it was Interstate's duty to "[r]ecruit, train, direct, supervise, employ . . . and dismiss on-site staff . . . for the operation of the Hotel."  Article IV also provided Interstate with "control and discretion in the operation, direction, management and supervision of the Hotel."  But the HMA also states that the "[n]othing in this Agreement shall constitute or be construed to be or create a partnership or joint venture between [Chelsea Grand] and [Interstate]" and that "all Hotel Employees shall be employees of [Chelsea Grand]."  Since the HMA's terms are ambiguous as to Interstate's responsibilities, the Court must next consider whether Interstate had sufficient control over the employees to be recognized as a joint employer.

The joint employer analysis considers whether two entities shared sufficient control over employees so that each is deemed an employer.  "[I]n a 'joint employer' relationship, there is no single integrated enterprise.  A conclusion that employers are 'joint' assumes that they are

---

[4] Chelsea Grand argues that Interstate's 2004 "me-too" agreement with the Union demonstrates that it was not previously bound by Roosevelt and Park Central's representations.  But one purpose of a "me-too" agreement is to claw back rights against the Union, which is exactly what Interstate did by excluding the Courtyard by Marriott JFK and the Starbucks in the Park Central Hotel from the IWA.  Notably, Interstate could have also excluded Chelsea Grand but did not do so.

separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly." *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985). Whether the company had "immediate control" over the employees is an essential element under the joint employer determination. *See id.* at 138. To determine whether immediate control existed, courts weigh the following five factors: (1) hiring and firing; (2) discipline; (3) pay, insurance, and records; (4) supervision; and (5) participation in the collective bargaining process. *See id.* at 138-139. These factors, however, are neither dispositive nor exclusive, and a court is free to consider other factors it deems relevant. *See Barfield*, 537 F.3d at 143.

### A.    Hiring and Firing

As a preliminary matter, Article III of the HMA explicitly gives Interstate the ability to recruit and dismiss employees. Chelsea Grand, however, argues that this provision was modified in practice. But the evidence does not support Chelsea Grand's claims. Interstate managers often assisted in hiring by requesting that the hotel hire new employees, reviewing resumes for the positions, and scheduling candidate interviews. Tr. at 499-50, 598. Further, the higher the position, the more Interstate was involved. Even with StarPerfect housekeeping employees, Interstate drafted disciplinary reports, and recommended that employees be fired. *Id.* at 600-04. In particular, Albert Doorfee,[5] then an Interstate employee, acted as general manager at the hotel and was directly involved in the hiring and firing process. For example, the employee handbook states that the general manager—in other words, Mr. Doorfee—would evaluate all termination evaluation requests. *Id.* at 609.

---

[5] Mr. Doorfee was an Interstate employee who was stationed at Four Points by Sheraton location. Eventually, he left Interstate to become a StarPerfect employee. His testimony was biased in favor of the interests of his current employer.

Chelsea Grand attempts to minimize Interstate's authority by claiming that StarPerfect and the Lam family had the ultimate authority to accept or reject Interstate's hiring and firing recommendations. *Id.* at 519-20. Specifically, Hung Luk testified that he "very rarely" followed Mr. Doorfee's recommendations and that he likely did so only one percent of the time. *Id.* at 520. Mr. Doorfee also testified he would often suggest that employees be fired, but that StarPerfect would not listen to him. *Id.* at 648. But the Court heard testimony and saw evidence suggesting that Interstate often recommended that individuals be fired and that Mr. Luk never told Mr. Doorfee to stop drafting these write-ups. *Id.* at 653. If Mr. Luk was so opposed to following Interstate's recommendations, he would have told Interstate to stop making them. Yet that never happened. Nor did Chelsea Grand attempt to reduce Interstate's lucrative fees. Finally, both Mr. Luk and Mr. Doorfee have a clear interest in downplaying Interstate's authority: Mr. Luk is an executive director at Chelsea Grand and Mr. Doorfee is currently employed by StarPerfect. As a result, the Court finds this testimony to be biased and affords their testimony little weight.[6]

Even if StarPerfect did have ultimate authority, that does not mean that Interstate did not have sufficient authority over the hiring and firing process to be deemed a joint employer. "The fact that the [other] agencies themselves may have exercised 'ultimate' authority in these areas does not alter the fact that [a party] also exercised some authority which helps establish the economic reality of its status as a joint employer." *Barfield v. N.Y.C. Health and Hosp. Corp.*, 537 F.3d 132, 144 (2d Cir. 2008). The Court holds that Interstate's role in the hiring and firing process supports the conclusion that Interstate had substantial control over Chelsea Grand's

---

[6] Similarly, Chelsea Grand went to great lengths to distinguish StarPerfect's hiring criteria from Interstate's criteria. In particular, Chelsea Grand's witnesses described the emphasis StarPerfect placed on hiring inexperienced workers with nice "smiles" as opposed to workers skilled in the industry. This testimony is simply not credible.

employees.  While others may also have been involved, that cannot negate the substantial role Interstate played in the hiring and firing of employees.

### B.    Discipline

Interstate also controlled the disciplinary process at Chelsea Grand.  As with hiring and firing, the employee handbook repeatedly refers to Mr. Doorfee's (Interstate's) role in the disciplinary process.  Furthermore, Mr. Luk testified on cross examination that Interstate managers were responsible for making sure that hotel employees complied with Starwood (not StarPerfect) standards.  If Interstate managers noticed that an employee was not in compliance, that manager would inform StarPerfect in a write-up or tell the employee directly.  Tr. at 454. Although Chelsea Grand claims that these write-ups were rarely followed, as the Court explained above, that testimony is not credible.  At a minimum, Interstate and StarPerfect had joint control over the disciplinary process, whereby Interstate and StarPerfect worked together to prepare reports and ultimately determine how to discipline employees.  For example, at trial, Ms. Kwon was shown one counseling write-up regarding an employee's poor performance.  She testified that she prepared the report, Mr. Doorfee signed it, and then she could not recall who terminated the individual.  *Id.* at 612-16.  These overlapping duties between StarPerfect and Interstate demonstrate that Interstate had sufficient control over the disciplinary process to constitute a joint employer.  *See Barfield*, 537 F.3d at 144.

### C.    Pay, Insurance, and Records

Interstate played a more limited role in providing the hotel employees with pay, insurance, and benefits.  The employee handbook states that any pay above the established rate would have to be approved by the general manager, *i.e.*, Mr. Doorfee.  Tr. at 609-10.  Chelsea Grand, however, argues that in practice StarPerfect ran human resources, which was responsible

for determining compensation and benefits.  *Id.* at 556-57.  Nevertheless, Interstate did not lack total control over the process.  For example, Interstate was indirectly involved in determining compensation by overseeing employee hours.  Ms. Kwon testified that if there was a discrepancy in an hours calculation, employees were supposed to speak to an Interstate manager, who would then report the issue to her.  *Id.* at 619.  Interstate also verified punch cards and drafted performance reviews, which directly affected employee compensation.  *See Barfield*, 537 F.3d at 144-45 (holding that a hospital which determined a nurse's hours and then paid the nursing referral agency an hourly rate for those hours exerted some control over compensation).

### D.   Collective Bargaining

There is no evidence that Interstate or StarPerfect played any role in the collective bargaining process at Chelsea Grand.  Thus, this factor is not relevant to the Court's joint employer determination.

### E.   Supervision

The Court heard voluminous testimony regarding Interstate's supervision of hotel employees.  Hotel employees clearly viewed Interstate managers as their supervisors.  For example, when a StarPerfect employee submitted a discrimination charge against the hotel, the hotel submitted an affidavit describing an Interstate manager as the "direct supervisor of the StarPerfect employee." Tr. at 698-99.  Notably, the Court heard no testimony to refute this view.  Furthermore, Mr. Doorfee, while employed by Interstate, held town hall meetings that required the attendance of all StarPerfect employees.  *Id.* at 607.  Mr. Doorfee, while employed by Interstate, was also responsible for approving sick leave and vacation requests.  *Id.* at 593-94, 609-18.  But when he testified at trial, Mr. Doorfee claimed that he did not know why he signed vacation authorization forms and that his signature ultimately meant nothing.  Tr. at 672-89.

This was not an exercise in modesty, but rather, duplicity. The Court does not credit Mr. Doorfee's testimony, which was obviously given to curry favor with his current employer. Interstate supervised hotel employees—both in policy and in practice—and therefore acted as a joint employer.

### F.  Other Considerations

The compensation paid to Interstate also demonstrates that Interstate was not acting as a mere consultant at Chelsea Grand. Mr. Luk testified that Interstate not only received a base fee of two percent of the total gross sales but also an incentive fee of an additional ten percent when the threshold of $3.25 million gross profit was achieved. Tr. at 394-95. As a result, from January 1, 2004 through January 1, 2007, Interstate was paid around $2 million as an incentive fee. *Id.* at 396. According to Mr. Luk, this was "in order to show [Chelsea Grand's] appreciation for . . . getting the franchise." *Id.* at 398. But the threshold to obtain an incentive fee was much lower than Chelsea Grand would have negotiated in other contracts. *Id.* at 398. It therefore stands to reason that Chelsea Grand would not have paid Interstate at such a high rate merely for consultant services; rather, Chelsea Grand was paying Interstate for actually supervising and controlling hotel operations.

It is also relevant to the joint employer analysis that the Lam family had very little experience in managing a hotel and therefore needed Interstate's assistance. The Lam family admits that StarPerfect was created so that it (and the Lam family) could learn how to manage hotel employees. *Id.* at 382; and StarPerfect needed Interstate's extensive support to accomplish this task. Interstate trained many of StarPerfect's managers in Interstate's management systems and the Starwood brand. *Id.* at 480, 481. In fact, Mr. Luk admitted that the family was inexperienced and that Interstate was one of its "teachers" in learning how to manage a Starwood

property. *Id.* at 451-52. Paula Kwon, StarPerfect's director of finance, also testified that Mr. Doorfe was her "sounding board since [she] didn't have as much experience." *Id.* at 582.

Overall, these considerations demonstrate that Interstate's responsibilities at Chelsea Grand were highly intertwined with StarPerfect's role. Interstate had immediate control over the employees in terms of hiring and firing, discipline, and supervision and therefore qualifies as a joint employer. The Court therefore holds that Interstate had bound Chelsea Grand to the 2001 IWA, including its arbitration and Card Count/Neutrality Clauses. As such, the Impartial Chairman did not exceed his authority, and the Court will not vacate the Award.

**IV.     Interstate Had Authority to Bind Chelsea Grand to the 2001 IWA**

The Union also argues that Interstate had the authority to bind Chelsea Grand to the 2001 IWA under agency principles. An express or implied agency relationship did not exist between Interstate and Chelsea Grand because Article XVI of the HMA acknowledged that Chelsea Grand desired a "non-union hotel." The Court therefore must consider whether Interstate had apparent authority to bind Chelsea Grand. "[A]pparent authority is conferred by the conduct of a principal which justifies a third party's belief that an agency relationship exists." *E.F. Hutton & Co. v. First Florida Securities, Inc.*, 654 F. Supp. 1132, 1142 (S.D.N.Y. 1987). "It is essential to the creation of apparent authority that words or conduct of the principal are communicated to a third party . . . giv[ing] rise to the reasonable belief that the agent possesses authority to enter into a transaction." *Prop. Advisory Grp., Inc. v. Bevona*, 718 F. Supp. 209, 211 (S.D.N.Y. 1989). Where a principal places an agent in a "'situation that a person of ordinary prudence conversant with business usages and the nature of the particular businesses is justified in assuming that such agent has authority to perform a particular act,'" the principal is estopped from denying the

agent's authority. *Id.* (quoting 2 N.Y. Jur. 2d Agency § 89). "The appointment of a person to a position with generally recognized duties may create apparent authority." *Id.*

Here, Chelsea Grand represented to third parties that Interstate was its "managing agent." For example, in 2005, Chelsea Grand refinanced the hotel through Merrill Lynch. Under the financing documents, Chelsea Grand named Interstate as managing agent for the hotel, and Merrill accepted Interstate's assignment based on the HMA. Specifically, the Conditional Assignment and Subordination of Management Agreement (the "Assignment") stated that "Borrower [Chelsea] employs Manager [Interstate] exclusively to operate and manage the Property." Furthermore, the Union identified checks from the hotel's operating account to vendors, third parties, and to StarPerfect that described Interstate as the "managing agent" for the hotel. Thus, Chelsea Grand cloaked Interstate with the authority to act as its agent in some respects and the Court must then consider the extent of Chelsea Grand's authorization.

Interstate's appointment as managing agent for Chelsea Grand was sufficient to support the Union's belief that Interstate had the authority to bind the hotel to the IWA. Richard Alexander Maroko, general counsel for the Union, testified that there was a general custom in the industry that when you negotiate with a management company, it is binding on the owner of the hotel unless there is an exclusion like an owner's letter. *See* Tr. at 89-90. He also testified that the Union had no reason to believe that Interstate did not speak on behalf of Chelsea Grand since that was the reason owners hire managing agents in the first place—"to take care of stuff on their behalf." *See id.* at 108. Peter Ward, president of the Union, further testified that he often relies on the authority of management companies to bind hotels and was presented with no reason to doubt Interstate's authority. *See id.* at 253-54. Indeed, it appears that Mr. Lam was well aware of this industry custom: Mr. Lam previously specified that Interstate was not to sign

a collective bargaining agreement on behalf of Best Western employees.  Furthermore, Mr. Lam went to great lengths to avoid unionization at Chelsea Grand, including approaching the garment workers' union, which had a much lower negotiated wage scale than did the hotel union workers.

Mr. Lam and Mr. Luk met with Edgar Romney, who was an officer in the garment workers' union, who represented Mr. Lam's workers in his textile business.  Mr. Romney testified about this meeting with Mr. Lam and Mr. Luk, in which they told him "that the hotel, that they would own it, but they would not run it, that it would be run by a management company." (Romney, at pg. 843).  Further, they sought a union contract, but at a much lower rate (the garment workers' rate) as opposed to the higher salary rates in the hotel workers' union contract.  They also said they did not want a contract with the hotel workers; Peter Ward was very difficult.  (Id. at 844).  This strong circumstantial evidence demonstrates that Mr. Lam and Mr. Luk (and Chelsea Grand) knew that they were bound by the Union contract with its managing agent, Interstate, and were simply attempting to minimize what they believed to be its financially burdensome wage rates.

In light of this evidence, Chelsea Grand's argument that the Union had to make reasonable inquiry into the scope of Interstate's authority is not convincing.  Nonetheless, Chelsea Grand persists that the Union would have been put on notice of Interstate's lack of authority had it requested the HMA, which "acknowledges that Owner desires to open and operate the Hotel as a non-union hotel."  Mr. Lam had conveyed to Peter Ward, the head of the Hotel union, that Mr. Lam generally did not want to be unionized.  But that wish does not outweigh or overcome the otherwise broad authority conferred on managing agents in the New York City hotel industry.  *See id.*

Chelsea Grand made Interstate its managing agent to obtain the Sheraton franchise. It recognized Interstate as its Managing Agent to secure a refinancing with Merrill Lynch. Chelsea Grand paid Interstate a lucrative fee to manage its hotel. Further, Mr. Lam and Mr. Luk acknowledged that Chelsea Grand was not operating the hotel; instead, it was managed by Interstate. This leads to but one conclusion: Interstate is clearly vested with apparent authority. Holding otherwise would allow Chelsea Grand to select the benefits of its management contract when it chooses to do so, while avoiding the burdens when it is inconvenient to bear them. Having taken on the relationship with an experienced hotel management company with a pre-existing labor and union relationship, Chelsea Grand was bound by it. Furthermore, Mr. Lam must have been aware of this pre-existing relationship, otherwise he would not have expended so much effort in avoiding the consequences of the relationship.

Accordingly, the Court holds that Interstate had the authority to bind Chelsea Grand to the terms of the 2001 IWA and therefore the Impartial Chairman did not exceed the scope of his authority in arbitrating the dispute.

## CONCLUSION

For the foregoing reasons, the Court confirms the Award rendered by the Impartial Chairman in favor of the Union. The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

Dated: New York, New York
       September 29, 2014

SO ORDERED

PAUL A. CROTTY
United States District Judge

22